Filed 10/13/15  In re Ivory H. CA

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| In re IVORY H., a Person Coming Under the Juvenile Court Law. | B261736 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> D.H., <br><br> Defendant and Appellant. | (Los Angeles County <br> Super. Ct. No. CK21108) |

APPEAL from an order of the Superior Court of Los Angeles County. Anthony Trendacosta, Judge.  Conditionally affirmed and remanded with directions.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

D.H. appeals from an order terminating her parental rights to her daughter, Ivory H. D.H. argues that the juvenile court erred in failing to apply the parent-child beneficial relationship exception to termination of parental rights in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1] She also contends that the juvenile court erred in concluding that the Indian Child Welfare Act (ICWA) did not apply based on an erroneous finding that the Department of Children and Family Services had provided adequate notice to the Native American tribes D.H. had identified to the Department. Although we conclude that D.H. has failed to demonstrate she had a sufficient parental relationship with Ivory to overcome the preference for adoption, the court erred in finding that the Department provided adequate notice under ICWA. Therefore, we conditionally affirm the termination order and remand the matter to the juvenile court for compliance with ICWA notice requirements.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *D.H.'s Children and Their Prior Involvement with the Dependency System*

D.H. is intellectually disabled and developmentally delayed. In 1996, when she was a minor, she came to the attention of the Department, and, as a result of dependency proceedings, she received permanent planning services and placement in a group home.

D.H. has given birth to six children. In 1995, when D.H. was 15 years old, she gave birth to S.H., who became the subject of dependency proceedings based on sustained allegations that D.H.'s developmental delays left her unable to care for the baby. Ultimately the court terminated D.H.'s parental rights and S.H. was adopted. D.H.'s son Albert A., born in 2001, became a dependent of the juvenile court in 2004 based on sustained allegations of physical abuse and general neglect by D.H., sexual

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

abuse by the child's father, and unsanitary living conditions. Albert was placed with his paternal grandmother and in 2008 the case was closed.

D.H.'s daughter Mariah L., born in 2007, became a dependent of the juvenile court in 2008 based on sustained allegations of neglect by D.H., exposure of the infant to domestic abuse between D.H. and Mariah's father, Larry L. Sr., and Larry Sr.'s history of substance abuse. In 2008 D.H. gave birth to a child who was born premature and died shortly after her birth. In 2009 D.H. gave birth to Larry L. Jr. who was detained shortly after his birth. Although the court ordered reunification services for both parents, reunification efforts were unsuccessful and the court terminated D.H.'s parental rights to Mariah and Larry Jr. in early 2011.

### B.   *The Dependency Proceedings Regarding Ivory H.*

1.   Detention

In April 2011 D.H. gave birth to Ivory H.[2] The Department responded to the hospital to assess concerns about D.H.'s ability to parent the newborn. D.H. confirmed that she had learning and cognitive disabilities, and appeared to lack insight into the reasons her other children had been removed from her custody. The Department filed a section 300 petition alleging under subdivision (b) that D.H. was unable to care for Ivory because D.H. had a "developmental delay and learning disabilities" that rendered her incapable of providing the child with regular care and supervision, and that D.H.'s other children had been dependents of the juvenile court and received permanent placement services. The court detained Ivory and placed her in foster care with Maria P. and Jose P.

---

[2]   D.H. initially identified Ivory's father as Jesus D. Paternity testing revealed, however, that Jesus D. was not Ivory's biological father, and the court dismissed all allegations referring to him. Robbie B. was subsequently identified as Ivory's alleged father. He never appeared in the action and the court did not order reunification services for him.

## 2. Jurisdiction and Disposition

The Department recommended that the juvenile court declare Ivory a dependent of the court and opposed reunification services based on D.H.'s failure to reunify with Ivory's siblings. The Department supported its recommendation with a letter from the Eastern Los Angeles Regional Center, which had been providing D.H. with advocacy and support services. Regional Center staff stated that D.H. was "incapable of providing a safe and stable living environment for" Ivory and, even though D.H. had received comprehensive services from the center for several years, showed "patterns of disinterest [*sic*], changing priorities, and poor decision making." Regional Center staff also believed reunification was not in Ivory's best interest and expressed "grave concerns about [D.H.'s] parenting abilities and fear[ed] for the health and safety of the child, if she [were] reunified with [D.H]."

The Department's jurisdiction and disposition report disclosed that D.H. claimed that she had "Cherokee lineage" through a maternal great-grandmother, Carol W., though D.H. had never registered as a member of a Cherokee tribe and was unaware of any family member who had registered. The Department sent a notice of the proceedings to the Cherokee tribes – the Cherokee Nation of Oklaho, the United Keetoowah Band of Cherokee Indians, and the Eastern Band of Cherokee Indians – but did not include information identifying D.H.'s great-grandmother. Although a number of the Cherokee tribes responded to the notice indicating that they had found no record of membership, the Cherokee Nation of Oklaho responded that the information in the notice was incomplete and the tribe requested additional identifying information.

At the combined jurisdiction and disposition hearing on July 5, 2011, the Department filed a review report stating that D.H. was receiving up to 50 hours of parenting skills and classes, counseling services, and support from a family services program. D.H. had supervised two-hour visits with Ivory twice a week. During the visits D.H., with the assistance of the family services program parent trainer, attended to Ivory's needs, comforted and engaged with her, and communicated with the foster

4

mother. D.H. appeared committed to parenting Ivory and brought appropriate childcare necessities to the visits.

The juvenile court sustained the allegations in the section 300 petition and found that ICWA did not apply. The court removed Ivory from D.H.'s custody and granted D.H. reunification services. The court ordered D.H. to comply with the instructions and services of the Regional Center and the family services program. The court ordered monitored visits for D.H. with Ivory.

### 3. Reunification Period

The Department's review reports reveal that in fall 2011 and winter 2012 D.H. participated in some services and completed a parenting class. She consistently visited Ivory twice a week for two hours per visit at a mall with the assistance of her parent trainer, who was at D.H.'s side at all times to direct her how to care for the child. The parent trainer reported that Ivory responded positively to D.H. during the visits, and that D.H. changed the baby's diaper and fed her. A Department social worker monitored a visit and observed that D.H. had difficulty supervising Mariah (who was also participating in the visit) while also caring for Ivory. The Department also reported that during the visits the parent trainer helped D.H. maintain awareness of her surroundings, and sometimes finished D.H.'s sentences when she struggled to communicate. The Department social worker doubted that D.H. would be able to visit and care for Ivory without assistance from the parent trainer.

Ivory appeared to transition to and from the visits with ease. She continued to reside with her foster parents, who provided Ivory with a stable and nurturing home environment and who expressed an interest in adopting the child.

The Department also reported that D.H. lacked suitable housing for a child, and that in January 2012 D.H. had been arrested for inflicting corporal injury on a spouse or

cohabitant.[3]  The Department continued to recommend that the court terminate D.H.'s reunification services.

At the 12-month permanency hearing in June 2012 the juvenile court ordered the Department to continue to provide D.H. with reunification services and "come up with a plan for mother with recommendations from various services providers to assess her ability to be alone with the child."  As a result of those efforts, the Department, D.H., and the parent trainer agreed that D.H. could have unmonitored six-hour visits once a week with the child in a public setting as long as the parent trainer was present during the visits.  D.H. complied with the new visitation schedule and arrangement.  The visits went well, and when D.H. missed visits she would call to check on Ivory.  D.H. brought Ivory small gifts, diapers, clothing, and food during the visits, and was affectionate towards Ivory.  Nevertheless, the Regional Center staff continued to express that D.H. was not competent to provide "sole supervision for her daughter" on a daily basis.  According to the Regional Center staff, D.H. had not demonstrated any improvement in her personal development; she would act responsibly for a few weeks and then regress.

The Department's reports also reflect that from fall 2012 to spring 2013 Ivory thrived with Maria and Jose, and appeared bonded to them.  Ivory cried when she was away from them, would "light[ ] up" upon their return, and called Maria "mommy."

On May 3, 2013 the juvenile court conducted the section 366.22 hearing and terminated D.H.'s reunification services.  The court scheduled a section 366.26 hearing to select and implement a permanent plan for Ivory.

---

[3]  D.H. shared an apartment with three adults, including her boyfriend, who reported the domestic abuse to police.  Although D.H. spent a few days in jail, the prosecution did not file charges against her.

4. Post-Reunification and Section 366.26 Proceedings

Ivory continued to do well with Maria and Jose, having lived with them since shortly after her birth. The Department identified them as Ivory's prospective adoptive parents and reported they had an approved adoption homestudy. Maria and Jose told the Department they would allow future monitored visitation between Ivory and D.H. after finalization of the adoption.

D.H., accompanied by her parent trainer, continued to have weekly visits with Ivory, who recognized D. H. and called her "mommy." Reports described Ivory as a happy and friendly toddler. The Department social worker monitored a visit between D.H. and Ivory in January 2015, shortly before the section 366.26 hearing. During the visit D.H. acted appropriately with Ivory, and brought her snacks and gifts. D.H. and Ivory expressed affection for each other. During the visit the social worker also spoke privately with the parent trainer, who shared her belief that D.H. could not care for or supervise Ivory without assistance.

The juvenile court conducted the section 366.26 hearing on January 21, 2015.[4] The court admitted the Department's reports into evidence, and heard argument from counsel. D.H. did not contest the court's finding that Ivory was adoptable, but instead argued that the court should apply the parent-child beneficial relationship exception to the termination of parental rights in section 366.26, subdivision (c)(1)(B)(i), because D.H. had visited with Ivory consistently, played a parental role during the visits, and shared a strong bond with the child. Counsel for D.H. argued that termination of their relationship would be contrary to Ivory's best interests. Counsel for D.H. also asked the court to

---

[4] On the day of the section 366.26 hearing, D.H. filed a section 388 petition, requesting that the court vacate the hearing, liberalize D.H.'s visits with Ivory, and reinstate reunification services. D.H. supported the petition with a letter from the parent trainer stating that Ivory called D.H. "mommy" during the visits, was excited when D.H. arrived, and appeared to enjoy holding D.H.'s hand. The court denied the petition.

continue the matter and order the Department to investigate the possibility of legal guardianship.

In response, counsel for the Department pointed out that, although Ivory referred to D.H. as "mommy," she also called her prospective adoptive mother "momma." The Department reminded the court that Ivory had been detained at birth and that, despite D.H.'s consistent visitation, the contact between Ivory and D.H. had always been supervised by the Department or a parent trainer. Counsel cited to the evidence showing there were genuine concerns regarding whether D.H. could ever assume a parental role without assistance and supervision.

The court found that Ivory was adoptable and that D.H. had failed to establish the parent-child beneficial relationship exception. The court found that D.H. never had unmonitored visits, noting that under the case law it is "hard if not almost impossible" for a parent to establish the parent-child beneficial relationship exception under such circumstances. The court observed that it was the child's foster parents who had met the child's needs on a daily basis, explaining that "there just isn't any comparison in terms of the parental role in balancing that parental role." The court stated, "I appreciate the fact that the child calls [D.H.] 'mommy[,]' but as has also been indicated, the child I think probably more easily relates to any person and certainly also recognizes the caretakers in the parental role as well, if not more, clearly more, than the biological mother. The child is developing as a child, and that's [ ] to the credit of the caretakers." The court explained, "Guardianship is not a preferred plan, even if the child is with a caretaker who might be interested." The court concluded that, because the parent-child beneficial relationship exception did not apply, the court had to terminate parental rights and free the child for adoption. The court terminated parental rights. D.H. appeals.[5]

_____

[5]    D.H.'s notice of appeal indicates that she is appealing from the order terminating her parental rights and the order denying her section 388 petition. Her brief, however, does not contain any argument with respect to the denial of the section 388 petition.

8

**DISCUSSION**

A. *The Juvenile Court Properly Found That the Parent-Child Beneficial Relationship Exception to the Termination of Parental Rights Did Not Apply*

"The purpose of the California dependency system is to 'provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, . . . and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm.' [Citations.] The dependency system is child-centered and is designed to protect the child, reunify the family where safe for the child and find a permanent home for the child when reunification is not possible. Its guiding light is the child's best interests." (*In re Y.M.* (2012) 207 Cal.App.4th 892, 913; see § 300.2.) If reunification with the family is not possible and the court terminates reunification services, the focus of the proceedings "'shifts to the needs of the child for permanency and stability.'" (*In re Celine R*. (2003) 31 Cal.4th 45, 52, quoting, *In re Marilyn H.* (1993) 5 Cal.4th 295, 309; see *In re D.M.* (2012) 205 Cal.App.4th 283, 289.)

At the permanency planning hearing held pursuant to section 366.26, the court determines a permanent plan for the child, and may order one of three alternative plans: adoption, guardianship, or long-term foster care. (See § 366.26, subd. (b); *In re J.C.* (2014) 226 Cal.App.4th 503, 528.) If the child is adoptable, "'there is a strong preference for adoption over the alternative permanency plans.'" (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395; see *In re Celine R., supra,* 31 Cal.4th at p. 53 [adoption is the Legislature's first choice because it gives the child the best chance at full commitment from a responsible caretaker, and, although guardianship is a more stable placement than foster care, it is revocable and therefore "'falls short of the secure and permanent future the Legislature had in mind for the dependent child.'"].) If the court finds by clear and convincing evidence that the child is adoptable, then the court must terminate parental rights. (See § 366.26, subd. (c)(1) ["[i]f the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate

9

parental rights and order the child placed for adoption"].)  "[T]o avoid termination of parental rights and adoption, a parent has the burden of proving, by a preponderance of the evidence, that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply."  (*In re Anthony B., supra,* 239 Cal.App.4th at p. 395.)

D.H. does not challenge the juvenile court's finding that Ivory is adoptable.  She argues only that the court erred in finding that the parent-child beneficial relationship exception in section 366.26, subdivision (c)(1)(B)(i), did not apply.  She argues that terminating her parental rights would be detrimental to Ivory.

The parent-child beneficial relationship exception exists where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because "the parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship."  (*Id.,* subd. (c)(1)(B)(i); see *In re Anthony B., supra,* 239 Cal.App.4th at p. 395.)  In deciding whether this exception applies, "'the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.'"  (*In re J.C., supra,* 226 Cal.App.4th at p. 528.)  "'If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.'"  (*Id.* at pp. 528-529.)  In addition, the parent-child relationship must "promote[ ] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*Ibid*.)  The factors the juvenile court considers in making this case-by-case assessment include the age of the child, the portion of the child's life spent in the parent's custody, the effects of the interaction between the parent and the child, and the child's particular needs.  (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.)

10

The parent-child beneficial relationship "exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) "A child who is determined to be a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may benefit the child to some degree but does not meet the child's need for a parent." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.) "It is not enough to show that the parent and child have a friendly and loving relationship." (*In re J.C., supra,* 226 Cal.App.4th at p. 530.) "'Interaction between [a] natural parent and child will always confer some incidental benefit to the child . . . . [Although] friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent.'" (*Ibid.*) Thus, "[n]o matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.] The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences.'" (*In re G.B., supra,* 227 Cal.App.4th at p. 1165.) Therefore, it is only in an "'extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.'" (*Id.* at p. 1166.)

We apply a composite standard of review to the juvenile court's determination whether the parent-child beneficial relationship exception to adoption applies. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) With regard to the court's factual findings, the applicable standard of review depends on whether the parent sustained his or her burden of proof on a particular issue. When, as here, the juvenile court determines that a parent has not satisfied his or her burden of proof, we decide whether, as a matter of law, the evidence compels a finding favorable to the parent. (See *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 ["where the issue on appeal turns on a failure of proof at trial,

11

the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"].) When the juvenile court determines that a parent has satisfied his or her burden, we apply the substantial evidence standard of review. (See *In re K.P.*, at p. 622.) Finally, if the court in the exercise of its discretion concludes there is a parent-child beneficial relationship but that the benefit to the child is not sufficiently compelling to outweigh the benefit of adoption, we review that conclusion for abuse of discretion. (See *ibid.*; accord, *In re Anthony B., supra*, 239 Cal.App.4th at p. 395; *In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315 (*Bailey J.*).)

D.H. maintained regular visits and contact with Ivory. From April 2011 to January 2015, almost without fail, D.H. spent time with the child once or twice a week for two to six hours per visit. Yet, the visitation never progressed to overnight or multi-day visits, nor is there any evidence that D.H. ever sought increased visitation prior to the day of the section 366.26 hearing when she filed a section 388 petition. Moreover, D.H.'s visits with Ivory were always supervised by the Department social workers, parent trainers, or both, all of whom consistently expressed doubts that D.H. could ever parent Ivory on her own.

Nevertheless, even assuming D.H.'s supervised and assisted visitation satisfied the "visitation" prong of section 366.26, subdivision (c)(1)(B)(i), the juvenile court properly found that the parent-child relationship did not rise to the level required under the benefit exception, and the evidence in the record does not compel a contrary finding. D.H.'s limited and supervised visitation affected her ability to create the kind of significant and compelling parent-child relationship generally required for application of the exception. By the time of the section 366.26 hearing, D.H. was almost four years old and had spent all of her life out of her mother's care. As the court observed in *In re Casey D.* (1999) 70 Cal.App.4th 38, it is particularly difficult for a parent to make the requisite parental-relationship showing where, as here, "the parents have essentially never had custody of the child nor advanced beyond supervised visitation." (*Id.* at p. 51.) True, by all accounts the visits were positive. During the visits D.H. nurtured Ivory, fed her, changed

her diaper, engaged with her, and grew attached to her. Ivory also appeared to have some connection with D.H: Ivory was happy to see D.H. and she called D.H. "mommy." Their weekly visits at the mall or the park seemed to bring genuine enjoyment to the child. The connection between D.H. and Ivory was not so strong, however, that it had any effect on the toddler after the visits ended. There was no evidence that Ivory suffered any detriment when she separated from D.H. or that Ivory had any awareness that D.H. occupied a uniquely parental role in her life.

To the contrary, the evidence showed that Ivory also called Maria, who took care of her daily needs, "momma," and that Ivory was an easygoing toddler who seemed to get along with everyone. Indeed, because of her disposition, or perhaps her age, Ivory was attached to all of her caretakers. Thus, although D.H. and Ivory had some attachment to each other, D.H. did not demonstrate a sufficiently compelling relationship with Ivory to deny the child the stability she would have in a permanent adoptive home with her caretakers.[6]

D.H. relies on *In re Brandon C.* (1999) 71 Cal.App.4th 1530 (*Brandon C.*). There, twin boys were removed from their mother's care at the age of four months and placed with the paternal grandmother. Although the mother received reunification services for 18 months, she failed to complete her case plan and the court terminated reunification services. By the time of the section 366.26 hearing, the mother had been consistently

---

[6] Contrary to D.H.'s assertion, the juvenile court did not apply the wrong legal standard in evaluating the quality of the relationships between D.H., Ivory, and Ivory's caretakers. In discussing whether D.H.'s limited visitation allowed her to play a parental role in Ivory's life, the court reflected on the day-to-day parenting activities of the caretakers. The court, citing *In re Casey D., supra*, 70 Cal.App.4th at page 52, commented on the challenges D.H. faced to satisfy the parent-child benefit relationship exception because she had never progressed beyond monitored visitation. Nothing about the court's comments demonstrates error in the application of the law or an impermissible comparison between the caretakers and D.H.

visiting the boys, who enjoyed the visits and called her "mommy." There was evidence that at least one of the twins suffered a detriment when he separated from his mother at the end of the visits: he would cry for long periods and resist going to bed. (*Id.* at p. 1535.) Moreover, "[t]he grandmother did not think it would be in the boys' best interest to terminate their relationship with mother and father, explaining that 'they still have a good relationship with their parents, and I think that should continue.'" (*Id.* at p. 1533.) The juvenile court found it would be in the boys' best interests to maintain their relationship with their mother, and ordered legal guardianship as the permanent plan. (*Ibid.*) The Court of Appeal affirmed, noting that "[t]he benefit of continued contact between mother and children must be considered in the context of the very limited visitation mother was permitted to have. In this case, mother was not the boys' primary caretaker, and a quantitative measurement of the specific amount of 'comfort, nourishment or physical care' she provided during her weekly visits is not necessary." (*Id.* at pp. 1537-1539.)

*Brandon C.* differs from this case in two significant ways. First, in *Brandon C.* there was evidence that at least one of the children suffered as a result of the separation from his mother, and the caretaker testified that severing the relationship between the mother and the children would be contrary to the children's interest. There is no such evidence in this case. Second, the procedural posture of the two cases is different. In *Brandon C.* the juvenile court, in balancing the children's interest in long-term stability through adoption against the interest in maintaining a parental bond, found that the bond outweighed adoption. Here, the juvenile court found otherwise. Thus, in applying the applicable standard of review, we are reviewing different exercises of discretion.

Nor is this case similar to the cases cited by D.H. where courts have found that the parent satisfied the parent-child beneficial relationship exception. Those cases involved older children, many of whom had resided with and developed significant relationships with their parents prior to removal from the home, and who appeared to suffer in the absence of the parental relationship. (See *In re C.B.* (2010) 190 Cal.App.4th 102, 126

14

[9- and 10-year-old children were "of an age where they are intellectually and emotionally aware of who their parents are" and had been able to express the detriment that termination of their parental relationships would cause them]; *In re Scott B.* (2010) 188 Cal.App.4th 452, 472 [11-year-old boy who had spent his first nine years living with his mother articulated the bond and connection to his mother, and would suffer detriment if the relationship were disrupted]; *In re S.B.* (2014) 164 Cal.App.4th 289, 295-296 [child's bond with her father established during the child's first three years of life persisted despite removal, and bonding study showed the child was at risk of harm if she were to lose the relationship with her father].)

Instead, this case is very similar to *Bailey J., supra,* 189 Cal.App.4th at page 1317 and *In re J.C., supra*, 226 Cal.App.4th at page 507. In *Bailey J.* the child, two years old at the time of the section 366.26 hearing, spent no part of his life with his mother, having been detained two days after his birth. The only basis for the parent-child relationship was a supervised weekly visit. In affirming the non-application of the parent-child beneficial relationship exception, the court observed: "At best, mother's supervised interactions with [the child] amounted to little more than play dates for him with a loving adult. Their frequent and loving contact was insufficient to show the requisite beneficial parental relationship. For instance, the mother produced no evidence that [the child] looked forward to visits with her or had difficulty separating from her at the end of their visits. While there was no evidence that the visits themselves were detrimental to [the child], there was also no evidence that [the child] benefitted from these visits. The undisputed evidence did not establish that the mother had a beneficial parental relationship with [the child]." (*Bailey J.*, at p. 1317.) Similarly in *J.C.*, the child was detained at birth based on the mother's failure to reunify with the child's siblings. The child never lived with mother, and the visits, while positive, were always monitored. (*In re J.C.,* at pp. 507, 532.) The court concluded that, although the mother had a bond with the child, "there was little evidence [the child] had a similar bond with Mother. . . . [The child's] outward affection for Mother proved loving contact on the level of a friendly visitor and not necessarily a substantial positive attachment." (*Id*. at p. 533.)

15

Like the children in *J.C.* and *Bailey J.*, Ivory was an affectionate child who separated from her mother with ease at the end of the visits and was equally connected to her caretakers. She was happy with D.H., she was happy without D.H. Ivory did not show the kind of deep attachment to D.H. that was present in cases involving older children who had an opportunity to bond with their parents prior to removal and had greater awareness of the familial roles of the adults in their lives.

Finally, even if we assume that the evidence compelled a finding that a beneficial parent-child relationship existed between D.H and Ivory, the juvenile court did not abuse its discretion by finding that the relationship between D.H. and Ivory was not sufficiently compelling that it overcame the strong legislative preference for adoption. (See § 366.26, subd. (c)(1)(B); *Bailey J., supra,* 189 Cal.App.4th at pp. 1314-1315.) D.H. did not introduce any evidence showing that termination of D.H.'s parental rights would harm Ivory or cause her great detriment, such as a bonding study or other evidence showing that Ivory was upset after visits with D.H. Rather, the record indicates that Ivory, while enjoying her visits with D.H., was attached, happy, and well-bonded to Maria and Jose and that she was thriving in their home.

Nor did the court err in failing to select a less permanent placement option, such as guardianship. As noted, "[i]f the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans." (*In re G.B.*, *supra*, 227 Cal.App.4th at p. 1165; see *In re I.R.* (2014) 226 Cal.App.4th 201, 211 ["[t]he permanent plan preferred by the Legislature is adoption"].) "'A guardianship . . . is not a permanent situation because a child remains within the jurisdiction of the juvenile court.' [Citations.] A guardianship 'is subject to change' and does not provide 'the same level of stability as adoption would provide.'" (*In re Jose C.* (2010) 188 Cal.App.4th 147, 160, fn. 8.) In particular, "guardianship is only the best possible permanent plan for children in circumstances where the exceptions to terminating parental rights in section 366.26, subdivision (c)(1) apply." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1420.)

B. *The Department Failed To Comply with the Notice Requirements of ICWA*

"'ICWA, enacted by Congress in 1978, is intended to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." [Citation.] " . . . ICWA presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important resource."' [Citation.] . . . ICWA defines an Indian child as 'an unmarried person under the age of 18 who is: 1) a member of an Indian tribe; or 2) eligible for membership in an Indian tribe and the biological child of a member of an Indian tribe.'" (*In re A.B.* (2008) 164 Cal.App.4th 832, 838.) When a court "knows or has reason to know that an Indian child is involved" in a juvenile dependency proceeding, the court must give the child's tribe notice of the pending proceedings and its right to intervene. (25 U.S.C. § 1912(a); *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1165.) The court must also give notice to the Bureau of Indian affairs where, as here, "the tribal affiliation is not known." (*In re L.S., Jr.* (2014) 230 Cal.App.4th 1183, 1197; see § 224.2, subd. (a)(4).) "'Notice is a key component of the congressional goal to protect and preserve Indian tribes and Indian families . . . [because it ensures] the tribe will be afforded the opportunity to assert its rights under [ICWA] irrespective of the position of the parents, Indian custodian or state agencies.'" (*In re A.G.* (2012) 204 Cal.App.4th 1390, 1396.)

An ICWA notice must include, if known, (1) the name, birthplace, and birth date of the Indian child; (2) the name of the tribe in which the Indian child is enrolled or may be eligible for enrollment; (3) names and addresses of the child's parents, grandparents, great-grandparents, and other identifying information; and (4) a copy of the dependency petition. (See 25 C.F.R. § 23.11(d)(3) (2003), 59 Fed.Reg. 2248 (eff. Feb. 14, 1994).) "[T]o establish tribal identity, it is necessary to provide as much information as is known on the Indian child's direct lineal ancestors." (25 C.F.R. § 23.11(b) (2003).) Because failure to provide proper notice of dependency proceedings may foreclose participation by the tribe, "ICWA notice requirements are strictly construed and must contain enough information to be meaningful." (*In re J.M.* (2012) 206 Cal.App.4th 375, 380.)

17

Here, the notice sent to the Cherokee tribes did not include the information D.H. had provided concerning her Cherokee Indian ancestry through her maternal great grandmother, Carol W. In addition, at least one of the tribes, the Cherokee Nation, sent a letter indicating that the information in the notice was incomplete and requesting additional information, including the complete name and date of birth of the maternal grandfather, as well as birth dates and maiden names of relevant family members. There is no evidence in the record that the Department attempted to correct these errors or sought additional information to respond to the letter from the tribe.

D.H. argues, the Department concedes, and we agree that the notices were defective, the Department failed to follow-up and provide the requested information, and that therefore the juvenile court erred in finding that ICWA did not apply. Therefore, we conditionally affirm the order terminating D.H.'s parental rights to Ivory and remand with directions to the juvenile court to order the Department to provide proper notice under ICWA as mandated by federal law, section 224.2, and California Rules of Court, rule 5.481(b)(1). (See *In re Gabriel G., supra,* 206 Cal.App.4th at p. 1168 [limited remand to ensure ICWA compliance]; *Tina L. v. Superior Court* (2008) 163 Cal.App.4th 262, 268 [same].)


**DISPOSITION**


The January 21, 2015 order terminating D.H.'s parental rights to Ivory is conditionally affirmed and the matter remanded to the juvenile court with directions to order the Department to comply with the notice provisions of ICWA and to provide adequate ICWA notices to all relevant tribes and the Bureau of Indian Affairs. If, after proper notice and inquiry, a tribe or the Bureau of Indian Affairs indicates that Ivory is an Indian child, the juvenile court is to consider which, if any, of its prior orders, in addition to the order terminating parental rights, should be vacated in order to conduct new proceedings consistent with the procedural and substantive requirements of ICWA. If

18

neither a tribe nor the Bureau of Indian Affairs indicates Ivory is an Indian child, then the juvenile court's order terminating parental rights is affirmed unconditionally.


SEGAL, J.


We concur:



ZELON, Acting P. J.




BECKLOFF, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.